IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SARAH HENSON, | ) | CASE NO.  1:24-CV-01692-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff, Sarah Henson ("Plaintiff" or "Henson"), challenges the final decision of Defendant, Frank Bisigano,[1] Commissioner of Social Security ("Commissioner"), denying her applications for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

In April 2022, Henson filed an application for POD, DIB, and SSI, alleging a disability onset date of December 31, 2020 and claiming she was disabled due to severe anxiety, depression, bipolar disorder, and panic attacks.  (Transcript ("Tr.") at 18, 463.)  The applications were denied initially and upon reconsideration, and Henson requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 18.)

---

[1] On May 7, 2025, Frank Bisigano became the Commissioner of Social Security.

On July 27, 2023, an ALJ held a hearing, during which Henson, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On October 20, 2023, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 18-30.)  The ALJ's decision became final on September 4, 2024, when the Appeals Council declined further review.  (*Id.* at 1-7.)

On October 1, 2024, Henson filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 8, 10.)  Henson asserts the following assignments of error:

(1) The ALJ erred in failing to find cervical radiculopathy to be a severe impairment and in failing to incorporate appropriate limitations for this condition into his assessment of RFC.

(2) The ALJ committed reversible error when he failed to adequately evaluate the limiting effects of Plaintiff's pain and anxiety in accordance with SSR 16-3p.

(3) Whether the ALJ's assessment of Residual Functional Capacity also failed to fully account for limitations arising from Plaintiff's physical and mental impairments, and thus lacked the required logical bridge between the evidence and the conclusions.

(Doc. No. 8.)

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Henson was born in May 1973 and was 50 years-old at the time of her administrative hearing (Tr. 18, 28), making her a "person closely approaching advanced age" under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(d), 416.963(d).  She has a limited education.  (Tr. 28.)  She has past relevant work as a fast-food worker.  (*Id.*)

### B.    Relevant Medical Evidence[2]

Henson's medical history includes a fusion of her lumbar spine (T11-L5) due to a tumor resection

_____

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

(osteogenic sarcoma).  (Tr. 826-27, 829).

An August 8, 2019 x-ray of the cervical spine showed "[c]onsiderable cervical spondylosis" and "[r]ight foraminal stenosis of C3-C6."  (*Id.* at 827.)

On January 29, 2020, Henson saw Stefan Papp, APRN-CNP, and reported completing physical therapy for her neck.  (*Id.* at 825.)  Henson told Papp that 300 mg of Neurontin improved her neck pain; however, she had been off it with increased discomfort, although she managed without it.  (*Id.*)  Henson rated her pain as a 3-7/10.  (*Id.*)  Henson reported feeling some weakness in her left upper extremity with hand grip after prolonged use, although she denied numbness, tingling, and dropping things.  (*Id.*)  Henson told Papp she felt a burning sensation in her left biceps and forearm with prolonged use.  (*Id.*)  Henson reported improved back pain.  (*Id.*)

On June 15, 2020, Henson saw Papp for follow up of her back and neck pain.  (*Id.* at 944.) Henson reported she had not yet gotten her EMG for her left arm because of transportation issues.  (*Id.*) Henson endorsed continued numbness and tingling in her left arm from her elbow to 10 cm above her wrist and admitted to weakness and dropping things.  (*Id.*)  She told Papp her neck pain was well managed with her current medications.  (*Id.*)  Henson reported a left-sided back pain flare.  (*Id.*)  She rated her pain as an 8/10 and told Papp the pain did not radiate.  (*Id.*)  Changes in position and posture, as well as flexion, aggravated her pain.  (*Id.*)  Stretches and a heating pad improved her pain, as did Neurontin.  (*Id.*) On examination, Papp found tenderness to palpation at the LS junction, flexion to 90 degrees with pain, extension to 10 degrees, positive straight leg raise test, normal sensation, normal strength of the lower extremities, and normal fine motor coordination.  (*Id.* at 947.)  Papp noted Henson's back pain seemed discogenic in nature and her cervicalgia was improved.  (*Id.*)  Henson's diagnoses consisted of lumbar discogenic pain syndrome, cervical myofascial pain syndrome, and paresthesia of the left arm.  (*Id.* at 947-48.)  Papp referred Henson to physical therapy for her low back pain and refilled Henson's prescriptions

for Flexeril and Neurontin.  (*Id.* at 948.)

On August 24, 2020, Henson saw Rachel Lynn Fields, PT, for her first physical therapy session. (*Id.* at 936.)  Henson reported intermittent back pain that she rated as a 6/10 that she described as sharp and worse on the left.  (*Id.* at 937.)  The pain woke her up at night.  (*Id.*)  Twisting, bending, overhead lifting, sitting, sleeping, and standing at work exacerbated her pain.  (*Id.*)  Stretching in the morning, using a heating pad, and using lumbar support improved her pain.  (*Id.*)  On examination, Fields found 4- to 5/5 strength, negative straight leg raise test, and minimal loss of range of motion.  (*Id.* at 937-38.) Fields further found limited flexibility.  (*Id.* at 938.)  Fields noted Henson's prognosis for therapy was good. (*Id.*)

An October 7, 2020 EMG revealed chronic left cervical radiculopathy at C8.  (*Id.* at 825, 827.)

On November 10, 2020, Henson saw Nurse Papp for follow up of her back and neck pain.  (*Id.* at 920.)  Henson reported a neck pain flare and rated her pain as a 4-7/10, with the left worse than the right. (*Id.*)  The pain radiated down her left arm from the humerus to mid forearm.  (*Id.*)  Henson endorsed mild weakness of her left upper extremity, tingling, and occasionally dropping things.  (*Id.*)  Henson also reported low back pain above the belt line that Henson rated as a 3-10/10 and described as constant aching.  (*Id.*)  Prolonged standing exacerbated her pain while stretches improved her pain.  (*Id.*)  On examination, Papp found normal and pain free range of motion of the cervical spine, "concordant tenderness of the middle and lower cervical paraspinals on the left," no evidence of neck spasm or trigger points, positive Spurling maneuver on the left, tenderness to the LS junction and bilateral SI joints, flexion to 90 degrees with pain, extension to 10 degrees, positive Faber's at the SI joint bilaterally, positive straight leg raise test, normal strength, and intact sensation.  (*Id.* at 924.)  Papp found no weakness or reflex/sensory abnormality of the left upper extremity on examination.  (*Id.*)  Papp noted Henson's back pain seemed to be more of an SI issue.  (*Id.*)  Henson's diagnoses consisted of cervical radiculopathy at

4

C7, sacroiliac joint dysfunction of both sides, paresthesia of the left arm, and lumbar discogenic pain syndrome.  (*Id.*)  Papp recommended Henson continue with physical therapy and Neurontin and receive bilateral SI joint steroid injections.  (*Id.* at 925.)

A December 18, 2020 MRI of the cervical spine revealed mild stenosis at C4-5 and C6-7 and moderate stenosis at C5-6.  (*Id.* at 826.)

On December 21, 2020, Henson saw Papp for follow up and reported she had not gotten the bilateral SI joint steroid injections and had not followed through with her physical therapy.  (*Id.* at 908.) Henson reported the physical therapist was unable to see her.  (*Id.*)  Henson endorsed continued bilateral SI pain that she rated as a 3-9/10 and described as constant and aching.  (*Id.*)  Flexion worsened the pain. (*Id.*)  Henson also reported intermittent neck pain with intermittent numbness and tingling over her left forearm.  (*Id.*)  Papp noted that these symptoms matched the EMG results but not the MRI findings.  (*Id.*) On examination, Papp found normal and pain free range of motion of the cervical spine, "concordant tenderness of the middle and lower cervical paraspinals on the left," no evidence of neck spasm or trigger points, positive Spurling maneuver on the left, tenderness to the LS junction and bilateral SI joints, flexion to 90 degrees with pain, extension to 10 degrees, positive Faber's at the SI joint bilaterally, positive straight leg raise test, positive SI compression test, normal strength, and intact sensation.  (*Id.* at 912.) Papp again found no weakness or reflex/sensory abnormality of the left upper extremity on examination. (*Id.*)  Henson's diagnoses consisted of sacroiliac joint dysfunction of both sides, paresthesia of the left arm, lumbar discogenic pain syndrome, and radiculitis of the left cervical region.  (*Id.*)  Papp reordered physical therapy for Henson's low back pain and continued Neurontin.  (*Id.* at 913.)  Papp noted Henson was to receive bilateral SI joint steroid injections the next day.  (*Id.*)

On January 12, 2021, Henson received a sacroiliac joint injection of the left side only, as Henson terminated the procedure before the right-side injection because of pain and anxiety.  (*Id.* at 901, 907.)

On January 14, 2021, Henson saw registered dietician Vicki Laganke and reported working full-time at Jersey Mike's.  (*Id.* at 905-06.)  Henson told Laganke she did all the cooking and grocery shopping.  (*Id.* at 906.)  For exercise, Henson stated she walked "a lot" because she did not drive and she was on her feet at work.  (*Id.*)

On January 26, 2021, Henson reported complete resolution of her left-sided back pain after the SI injection on the left.  (*Id.* at 901.)

On February 3, 2021, Henson saw Andrew Schmidt, PT, for her first physical therapy session.  (*Id.* at 897.)  Schmidt noted a history of chronic low back pain for which Henson had received left sided lumbar injections, which resolved the numbness and tingling in her left lower extremity.  (*Id.*)  As Henson could not tolerate the injections on the right, she continued to complain of radicular pain and intermittent numbness and tingling in her right lower extremity.  (*Id.*)  Henson reported working at a restaurant for six hours a day five days a week doing prep work.  (*Id.*)  On examination, Schmidt found 4+ to 5/5 strength, tenderness to palpation over the right-side lumber paraspinals and piriformis musculature, mildly antalgic gait, poor posture and body mechanics with lifting, decreased range of motion of the hip, positive SLUMP test in the right lower extremity, and decreased core strength.  (*Id.* at 899-900.)

On February 24, 2021, Henson saw Schmidt for her second physical therapy session and rated her pain as a 6/10 that day.  (*Id.* at 895-96.)  Henson reported doing her home exercise program daily, which had increased her pain but decreased the frequency of numbness and tingling down her right leg.  (*Id.* at 896.)  On examination, Schmidt found 4+ to 5/5 strength and mildly antalgic gait.  (*Id.*)

On March 3, 2021, Henson saw Schmidt for her third physical therapy session and rated her pain as a 4/10 that day.  (*Id.* at 893-94.)  Henson reported the right side of her back was now pain free and the numbness and tingling in her right leg was gone.  (*Id.* at 894.)  However, she told Schmidt she now had pain on the left side of her back.  (*Id.*)  On examination, Schmidt found 4+ to 5/5 strength and mildly

antalgic gait.  (*Id.*)  Henson declined heat/ice pack that day.  (*Id.*)

On May 18, 2021, Henson saw Virginia Jindra, APRN-CNP, to establish care.  (*Id.* at 887.) Henson reported taking Gabapentin intermittently for her chronic back pain.  (*Id.*)  Henson endorsed mild fatigue associated with a high TSH, as well as some intermittent pain from varicose veins around her knees.  (*Id.* at 888.)  On examination, Jindra found full range of motion of the cervical spine without pain and full strength of the upper and lower extremities.  (*Id.* at 891.)

On June 30, 2021, Henson saw Nurse Papp for follow up and reported she had done three physical therapy sessions as she had issues with work.  (*Id.* at 878.)  Henson complained of back pain across the mid lumbar spine that radiated into the left lateral thigh a few times a week.  (*Id.*)  Henson rated her pain as a 4-8/10.  (*Id.*)  Prolonged standing worsened her pain while rest improved it.  (*Id.*)  Henson told Papp the pain was worse with extension.  (*Id.*)  Henson reported "minimal" left-sided neck pain without radiation into her arms that was "well managed" with Neurontin.  (*Id.*)  On examination, Papp found tenderness to palpation of the upper lumbar spine paraspinals, flexion to 80 degrees, extension to 5 degrees with worsening pain, negative straight leg raise test, negative Faber's, normal sensation, normal strength, and normal fine motor coordination.  (*Id.* at 882.)  Papp reordered physical therapy, continued Neurontin, and ordered medial branch blocks.  (*Id.*)

On July 19, 2021, Henson saw Amy Green, APRN-CNP, for symptomatic varicose veins.  (*Id.* at 870-71.)  Henson endorsed pain, itching, tingling, heaviness, and tiredness of her bilateral lower extremities.  (*Id.* at 871.)  On examination, Green found small varicosities on the anterior and posterior knee and thigh on the left and reticular veins on the lateral thigh and small varicosities on the posterior calf on the right.  (*Id.* at 873.)  Green ordered a Duplex scan and VVI study and prescribed compression stockings for symptom relief.  (*Id.*)  Green also recommended increased ambulation and warm compresses and/or ibuprofen as needed for pain.  (*Id.*)  Green emphasized the importance of elevation as well.  (*Id.*)

On July 30, 2021, Henson saw gastroenterologist Nisheet Waghray, M.D., for complaints of bloating and abdominal pain.  (*Id.* at 865.)  Given Henson's symptoms, Dr. Waghray ordered an EGD to evaluate Henson for possible peptic ulcer disease from NSAID use and for H. Pylori.  (*Id.* at 868.)

On August 16, 2021, Henson went to the emergency room for complaints of high blood pressure and abdominal pain with nausea. (*Id.* at 858.)  Henson also reported heart palpitations that occurred multiple times a day that she thought was caused by anxiety.  (*Id.*)  On examination, treatment providers found a mildly tender abdomen with no guarding, rebound, or focal tenderness, no significant abnormalities of lab results, and no evidence of cardiac or cardiopulmonary etiology for the heart palpitations.  (*Id.* at 860.)  Treatment providers noted case management was working on getting approval for antibiotics from Henson's insurance company to treat Henson's H. Pylori infection.  (*Id.* at 861.)  Henson's diagnoses consisted of heart palpitations, anxiety, and dyspepsia.  (*Id.*)  Treatment providers discharged Henson in stable condition and advised her to follow up with her primary care physician and gastroenterologist.  (*Id.*)

On August 18, 2021, James Psarras, M.D., admitted Henson for psychiatric evaluation and treatment after Henson reported having a panic attack and being suicidal.  (*Id.* at 1280.)  Henson told Dr. Psarras that she treated with a psychiatrist, and she was supposed to see him this week; however, she had not seen him yet and felt she could not wait, so she went to the emergency room.  (*Id.*)  Henson reported a suicidal plan to overdose.  (*Id.*)  Henson also endorsed depression, lack of energy, lack of motivation, inability to work, inability to focus, sleep disturbances, agitation, anhedonia, severe anxiety, and acute safety concerns.  (*Id.* at 1280-81.)  On examination at admission, Dr. Psarras found Henson cooperative, tearful, and anxious, with fair eye contact, a flat, tearful, and not overly constricted mood and affect, acute suicidality, although Henson stated she did not really want to die, full orientation, normal attention and concentration, normal memory, normal speech, fair judgment, and limited insight.  (*Id.* at 1282.)  During

8

her stay, Henson was "not insightful" about her medication and tried to get the weekend doctor to stop her Klonopin.  (*Id.* at 1292.)  Dr. Psarras noted Henson showed "consistent improvement" when Klonopin was increased up to .5 mg three times a day.  (*Id.*)  Henson's increased anxiety caused increased blood pressure, which then made Henson more anxious.  (*Id.* at 1292-93.)  At the time of Henson's discharge, she did not feel ready and asked to continue to stay.  (*Id.* at 1293.)  Henson continued to struggle with anxiety and was frightened by her blood pressure.  (*Id.*)  Dr. Psarras started Henson on Pristiq, which made Henson less tearful.  (*Id.*)  Dr. Psarras restarted Klonopin at 0.5 mg twice a day and Henson started to show some improvement.  (*Id.*)  While Henson still showed high anxiety, Dr. Psarras decided to go ahead and discharge her on September 3, 2021, which Henson allowed.  (*Id.*)  On examination at discharge, Henson was still "somewhat depressed" and "highly anxious," and she "somatized most of her physical symptoms."  (*Id.*)  However, Henson was "gradually improving" from a psychiatric standpoint and was medically stable and fully functional.  (*Id.*)  Henson's diagnoses consisted of bipolar disorder, mixed, and generalized anxiety.  (*Id.*)

On September 9, 2021, Henson underwent a behavioral health assessment with Jessica Sinur, LPCC, to establish care following Henson's inpatient admission.  (*Id.* at 1188.)  Henson endorsed sadness, occasional hopelessness, loss of interest, worthlessness, insomnia, fatigue/lack of energy, decreased appetite, nervousness, uncontrolled worry, poor concentration, muscle tension, stomachaches, palpitations, sweating, shortness of breath, chest pain, nausea/GI distress, and restlessness.  (*Id.* at 1189.)  Henson told Sinur she had left her job recently because of increased anxiety.  (*Id.*)  On examination, Sinur found good eye contact, restless motor activity, normal speech, anxious mood, congruent affect, appropriate demeanor, normal thought content and thought process, normal perception, alert attention, full orientation, appropriate insight and judgment, and intact memory.  (*Id.* at 1193.)  Henson's diagnoses consisted of generalized anxiety disorder and major depression, recurrent, moderate.  (*Id.*)

9

On September 14, 2021, Henson saw Nurse Jindra for follow up regarding her hypertension and anxiety. (*Id.* at 843.) Henson told Jindra she would be out of Ambien that day. (*Id.*) Jindra provided a two-week refill until Henson could be seen by psychiatry. (*Id.*)

On September 24, 2021, Henson saw Dr. Waghray for follow up and reported she had completed the course of antibiotics for H. Pylori treatment during her hospital stay. (*Id.* at 839.) Henson's diagnoses consisted of mild gastroduodenitis and a 2 cm hiatal hernia. (*Id.* at 840-41.) Dr. Waghray started Henson on Prilosec. (*Id.* at 841.)

On September 27, 2021, Henson saw Ashley Cohen, LSW, for counseling and reported an improvement in her depression symptoms. (*Id.* at 1182.) On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, and appropriate insight and judgment. (*Id.* at 1183.)

On September 30, 2021, Henson saw Elizabeth Carroll, APN, for an initial psychiatric evaluation. (*Id.* at 1176.) Carroll noted Henson was hyperverbal and difficult to follow due to rapid and circumstantial speech. (*Id.* at 1177.) Henson reported medication compliance and told Carroll that Vistaril helped her anxiety but left her tired, and she thought Pristiq was helping her mood and anxiety. (*Id.*) Henson thought Propranolol was not helpful. (*Id.*) Henson endorsed sadness, nerviousness/anxiousness, hypervigilance, uneasiness, and panic. (*Id.*) On examination, Carroll found good eye contact, restless motor activity, rapid speech, anxious mood, constricted affect, appropriate demeanor, normal thought content, circumstantial and tangential thought process, normal perception, alert attention, full orientation, fair insight, appropriate judgment, and intact memory. (*Id.* at 1179.) Carroll started Henson on Gabapentin, discontinued Propranolol, and continued Ambien, Klonopin, Pristiq, and Hydroxyzine. (*Id.* at 1180.)

On October 8, 2021, Henson had a telephone counseling session with Cohen. (*Id.* at 1174.) On

examination, Cohen found cooperative behavior, normal speech, a sad, nervous, and anxious mood, appropriate affect, normal thought process and thought content, normal perception, and appropriate judgment and insight.  (*Id.* at 1175.)

On October 18, 2021, Henson saw Cohen for follow up and reported her mood was about the same but she had increased depression symptoms.  (*Id.* at 1172-73.)  Henson told Cohen she noticed her depression in the morning but felt better after she started the day.  (*Id.* at 1173.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought process and thought content, normal perception, and appropriate judgment and insight.  (*Id.*)

On October 21, 2021, Henson saw Nurse Carroll for medication management.  (*Id.* at 1168.) Henson reported that she was not yet back at work, as her anxiety remained problematic, and she felt worried about being triggered or overwhelmed.  (*Id.* at 1169.)  Henson endorsed nervousness/anxiousness, uneasiness, and fearfulness.  (*Id.*)  On examination, Carroll found Henson hyperverbal with normal thought content, circumstantial thought process, normal perception, alert attention, full orientation, appropriate insight and judgment, and intact memory.  (*Id.* at 1170.)  Carroll increased Gabapentin and continued Pristiq, Ambien, hydroxyzine, and clonazepam.  (*Id.* at 1172.)

On November 11, 2021, Henson saw Carroll for medication management.  (*Id.* at 1163.)  Henson reported starting back at Jersey Mike's part-time the week before.  (*Id.* at 1164.)  Her depression "remain[ed] significantly lifted," and while she continued to have some anxiety, Gabapentin was helping. (*Id.*)  On examination, Carroll found Henson hyperverbal with an anxious mood, appropriate demeanor, normal thought content, circumstantial thought process, full orientation, appropriate insight and judgment, and intact memory.  (*Id.* at 1165.)

On November 15, 2021, Henson saw Cohen for counseling and "reported a moderate decrease in anxiety and depressive symptoms" because of starting her new job.  (*Id.* at 1161.)  Henson told Cohen her

job kept her motivated and "'out of her head.'"  (*Id.* at 1162.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate judgment and insight.  (*Id.*)  Cohen found minimal improvement since Henson's last session.  (*Id.*)

On November 29, 2021, Henson saw Cohen for counseling and reported that her anxiety was less, although it was still there, and she was "'not as happy as [she] would like to be.'"  (*Id.* at 1158-59.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment.  (*Id.* at 1159.)

On  December 14, 2021, Henson saw Cohen for counseling and reported increased anxiety because of her job.  (*Id.* at 1155-56.)  Henson told Cohen an eight-hour shift was too much for her at the moment and she felt like her heart was racing by the end of her shift.  (*Id.* at 1156.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment.  (*Id.*)

On December 16, 2021, Henson saw Carroll for medication management.  (*Id.* at 1151.)  Henson reported a lot of staff at work had been off lately, which led to pressure for her to stay longer and manage extended shifts, which then increased her anxiety.  (*Id.* at 1152.)  On examination, Carroll found normal speech, anxious mood, appropriate demeanor, normal thought content, circumstantial thought process, normal perception, full orientation, appropriate insight and judgment, and intact memory.  (*Id.* at 1153.)

On December 20, 2021, Henson saw Cohen for counseling and reported feeling "overwhelmed with work" earlier that week but she was okay now.  (*Id.* at 1149-50.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate judgment and insight.  (*Id.* at 1150.)

On December 28, 2021, Henson saw Cohen for counseling and reported a "'depressed and anxious'" mood.  (*Id.* at 1147-48.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate judgment and insight. (*Id.* at 1148.)

A January 7, 2022 lumbar spine MRI revealed "[p]ostsurgical changes related to scoliosis hardware with associated degenerative disc disease at T9-T10 and L5-S1." (*Id.* at 826.)

On January 25, 2022, Henson saw Cohen for counseling and reported crying spells and panic attacks at work, as well as difficulty managing her emotions at work.  (*Id.* at 1145-46.)  Henson felt her medications were working a little bit.  (*Id.* at 1146.)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment.  (*Id.*)  Cohen found Henson demonstrated "mild psychological impairment" and "minimal improvement" since Henson's last session. (*Id.*)

On January 27, 2022, Henson saw Carroll for medication management.  (*Id.* at 1140.)  Henson reported that work was "going well" and she felt "well-supported when she becomes overwhelmed." (*Id.*)  Henson told Carroll she sometimes got tearful when she was anxious, but Gabapentin helped.  (*Id.*)  On examination, Carroll found normal speech, anxious mood, appropriate demeanor, normal thought content, circumstantial thought process, normal perception, full orientation, appropriate judgment and insight, and intact memory. (*Id.* at 1142.)  Carroll continued Henson's medications.  (*Id.* at 1143.)

On February 10, 2022, Henson saw Cohen for counseling.  (*Id.* at 1138.)  Henson reported an anxious mood and "a mild increase in anxiety symptoms" because of work.  (*Id.* at 1139.)  Henson told Cohen she had been having more crying spells and sleep problems.  (*Id.*)  On examination, Cohen found generally relaxed and engaged behavior, normal speech, neutral mood, appropriate affect, normal thought content, normal perception, and appropriate insight and judgment.  (*Id.*)

13

On February 28, 2022, Henson saw Nurse Papp for complaints of back and neck pain.  (*Id.* at 824.) Henson reported right-sided thoracic back pain that radiated up from her knee to her right breast.  (*Id.*) Henson rated her pain as an 8-10/10 and described it as constant aching.  (*Id.*)  Motrin helped a little, and Lidocaine reduced the pain.  (*Id.*)  The pain worsened with flexion and improved with extension.  (*Id.*) Henson reported improved lower back pain, and it no longer radiated down her legs.  (*Id.*)  Papp noted that a January 2022 MRI of the lumbar spine revealed "accelerated degenerative disc disease at T9-10 and L5-S1."  (*Id.* at 826.)  On examination, Papp found tenderness to palpation at T8-10 on the right, flexion of 80 degrees, and extension to 5 degrees with worsening pain.  (*Id.* at 829.)  Papp noted Henson's rib pain was "likely intercostal neuralgia."  (*Id.*)  Papp ordered an x-ray of the thoracic spine and an intercostal nerve block.  (*Id.*)  Papp also prescribed a lidocaine patch.  (*Id.*)

On March 17, 2022, Henson saw Carroll for medication management and reported increased stomach pain, stress, anxiety, and frequent crying.  (*Id.* at 1133-34.)  Henson told Carroll that Gabapentin helped some.  (*Id.* at 1134.)  On examination, Carroll found normal speech, anxious mood, normal thought process, circumstantial thought process, normal perception, appropriate insight and judgment, and intact memory.  (*Id.* at 1136.)  Carroll adjusted Henson's medications.  (*Id.*)

On May 3, 2022, Henson saw Carroll for medication management and reported high anxiety and sleep problems, as well as racing thoughts and tearfulness.  (*Id.* at 1128-29.)  Henson told Carroll that Ambien stopped working well a while ago and she had not taken it for about a month.  (*Id.* at 1129.) Carroll noted Henson was to start intensive outpatient therapy in June.  (*Id.*)  Henson reported she had been missing a lot of work because of her anxiety.  (*Id.*)  On examination, Carroll found normal speech, anxious mood, normal thought process, circumstantial thought process, normal perception, and appropriate insight and judgment.  (*Id.* at 1131.)  Carroll started Henson on Flexeril and discontinued hydroxyzine.  (*Id.*)

14

On May 24, 2022, Henson saw Carroll for medication management and reported her ex showed up drunk at her house the night before and she had to call the police.  (*Id.* at 1124-25.)  Henson told Carroll her ex was now "harassing her by text."  (*Id.* at 1125.)  On examination, Carroll found anxious mood, ruminations, circumstantial thought process, normal perception, and appropriate insight and judgment.  (*Id.* at 1126.)  Carroll noted Henson was talkative and "tearful/tense sounding."  (*Id.*)

On June 14, 2022, Henson began the Outpatient Partial Hospitalization/Intense Outpatient Program at Highland Springs Hospital.  (*Id.* at 754.)  Henson reported severe anxiety and quitting her job because of stress.  (*Id.*)  She ran out of her Klonopin two weeks prior because she had misunderstood how often she was supposed to be taking it.  (*Id.*)  Henson rated her depression as a 4/10 and her anxiety as a 7/10.  (*Id.*)  She endorsed sleep difficulties, racing thoughts, occasional difficulties with concentration, worrying, panic attacks, restlessness, and irritability.  (*Id.*)  On examination, treatment providers found fair grooming, depressed and anxious mood, full range of affect, spontaneous speech, circumstantial associations at times, fair attention and concentration, intact memory, and fair judgment and insight.  (*Id.* at 756.)  Henson participated in scheduled group therapy.  (*Id.* at 783-801.)  Treatment providers administratively discharged Henson on July 6, 2021, after she missed three consecutive days.  (*Id.* at 803.)

On July 12, 2022, Henson saw Carroll for medication management and reported she was on vacation with her family, which had thrown off her sleep schedule.  (*Id.* at 1119-20.)  Henson told Carroll her ex had assaulted her the week before, which resulted in the police responding and Henson having a panic attack in the ambulance.  (*Id.* at 1120.)  Henson pressed charges, but her ex had been released the day before, which made her nervous.  (*Id.*)  She told Carroll she had been missing work and was worried about money.  (*Id.*)  On examination, Carroll found anxious mood, ruminations, circumstantial thought process, normal perception, and appropriate insight and judgment.  (*Id.* at 1121.)  Carroll noted Henson was talkative and polite but sounded weary.  (*Id.*)  Carroll continued Henson's medications and increased

15

Flexeril. (*Id.* at 1122.)

On August 19, 2022, Henson saw Susan Whittaker, APN, for medication management and reported severe panic attacks after her boyfriend attacked and strangled her. (*Id.* at 1488-89.) Henson also endorsed ruminating thoughts and sleep difficulties. (*Id.* at 1489.) On examination, Whittaker found normal speech, full range of affect, neutral/euthymic and anxious mood, ruminations, goal-directed and linear thought process, normal perception, distracted attention, appropriate demeanor, full orientation, intact memory, and appropriate judgment and insight. (*Id.* at 1490.) Whittaker provided a short course of Xanax for Henson's severe anxiety. (*Id.*)

On September 19, 2022, Henson saw Nurse Whittaker for medication management and reported she continued to be very anxious and was not sleeping. (*Id.* at 1482.) Whittaker noted Henson demonstrated rapid speech and rumination. (*Id.*) On examination, Whittaker found full range of affect, neutral/euthymic, depressed, and anxious mood, goal-directed, linear, and distractible thought process, normal perception, appropriate demeanor, appropriate insight and judgment, and intact memory. (*Id.* at 1484.) Whittaker adjusted Henson's medications. (*Id.* at 1485.)

On November 16, 2022, Henson saw Whittaker for medication management and reported Xanax had been helpful, and she wished to discontinue Klonopin. (*Id.* at 1470-71.) Henson told Whittaker she was still very anxious and not sleeping. (*Id.* at 1471.) On examination, Whittaker found rapid, pressured speech, ruminations, good eye contact, full range of affect, depressed and anxious mood, depressive cognitions, circumstantial thought process, normal perception, alert attention, appropriate demeanor, full orientation, intact memory, and appropriate insight and judgment. (*Id.* at 1472.) Henson's diagnoses consisted of insomnia due to other mental disorder, generalized anxiety disorder, PTSD, and insomnia, unspecified type. (*Id.* at 1473.) Whittaker adjusted Henson's medications. (*Id.*)

On December 9, 2022, Henson saw Nurse Jindra for follow up and complained of left-sided back

pain.  (*Id.* at 1599.)  Henson reported she was having difficulty working more than four hours at a time and she could not sit for very long.  (*Id.*)  Henson described her pain as sharp and stabbing and was worse with activities and extended sitting.  (*Id.*)  The pain radiated cranially but did not radiate down her leg.  (*Id.*)  On examination, Jindra found normal strength of the bilateral lower extremities, intact sensation, the ability to stand on heels and toes, and no tenderness to palpation over the left SI joint or lumbar spine region.  (*Id.* at 1602.)  Jindra recommended Henson undergo a medial branch block.  (*Id.*)

On January 24, 2023, Henson saw Whittaker for medication management and reported she continued to be more anxious than baseline, but she was making small improvements.  (*Id.* at 1652-53.)  Whittaker noted she was continuing to monitor Henson for hypomania.  (*Id.* at 1653.)

On February 3, 2023, Henson saw Michael Weber, M.D., for a feeling of something in her throat when she swallowed and reported exercising for two hours four times a week.  (*Id.* at 1615, 1617.)

On February 13, 2023, Henson told Whittaker she was trying to work when she could.  (*Id.* at 1648-49.)

On March 13, 2023, Henson saw Whittaker for medication management and reported crying spells and anxiety.  (*Id.* at 1644.)  Whittaker adjusted Henson's medications.  (*Id.* at 1646-47.)

On April 10, 2023, Henson saw Whittaker for medication management and reported she had stopped taking Cymbalta after she broke out in hives and wasn't feeling like herself.  (*Id.* at 1811-12.)  Whittaker adjusted Henson's medications.  (*Id.* at 1814.)

On May 5, 2023, Leslie Valentine, LISW, completed a Medical Source Statement – Mental Capacity and opined Henson had extreme limitations in the following areas: ask for help when needed; handle conflicts with others; respond to requests, suggestions, criticism, correction, and challenges; keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness; and manage psychologically-based symptoms.  (*Id.* at 1856-57.)  Valentine further opined Henson had marked

limitations in the following areas: cooperate with others; state her point of view; ignore or avoid distractions while working; sustain an ordinary routine and regular attendance at work; respond to demands; and adapt to changes.  (*Id.*)  Valentine based her opinion on Henson's diagnoses of PTSD, bipolar II disorder, and generalized anxiety disorder.  (*Id.* at 1857.)  Valentine stated that Henson had suffered physical, emotional, financial, and psychological abuse from her partner, which had left her with a dysregulated nervous system.  (*Id*.)  As a result, Henson decompensated and was unable to manage employment.  (*Id*.)

On May 11, 2023, Nurse Whittaker completed a Medical Source Statement – Mental Capacity and opined that Henson had moderate limitations in several areas, but no marked or extreme limitations.  (*Id.* at 1899-1900.)  Whittaker based her opinion on Henson's diagnoses of PTSD, major depressive disorder, recurrent, moderate, and generalized anxiety disorder.  (*Id.* at 1900.)  Whittaker opined that Henson had "disabling anxiety" that was triggered by a recent assault from Henson's partner, "combined with severe psychogenic urticaria, and panic symptoms."  (*Id*.).  Whittaker further opined that Henson "has not been successful since this event in returning to her previous level of functioning."  (*Id*.)

On May 17, 2023, Henson saw Whittaker for medication management and reported being "'triggered all the time'" over the past few weeks.  (*Id.* at 1903-04.)  Whittaker increased Cymbalta.  (*Id.* at 1907.)

On May 30, 2023, Henson saw Nurse Jindra for complaints of heart palpitations and shortness of breath after minimal activity.  (*Id.* at 1938.)  On examination, Jindra found normal heart rate and rhythm, normal heart sounds, normal pulmonary effort, normal breath sounds, and no edema.  (*Id.* at 1942.)  Jindra ordered a cardiovascular event detector service RQST, chest x-ray, echocardiogram, EKG, and blood work.  (*Id.* at 1943.)

On June 2, 2023, Henson saw Ann Harrington, APRN-CNS, for complaints of back pain.  (*Id.* at

18

1933.)  Harrington noted Henson had last seen Nurse Papp in February 2022.  (*Id.*)  Henson reported difficulty working more than four hours at a time because of her pain, and her pain prevented her from being able to sit, stand, or walk for a period of time.  (*Id.*)  Henson described her pain as intermittent, sharp, and stabbing, and radiated cranially.  (*Id.*)  Activities, extended sitting, and extended standing exacerbated her pain.  (*Id.*)  Ibuprofen helped a little bit.  (*Id.*)  Henson reported Gabapentin had helped in the past.  (*Id.*)  Flexeril made her too tired.  (*Id.*)  Henson wanted to know if there were different injections she could receive, since previous injections had helped her pain.  (*Id.*)  On examination, Harrington found "[m]inimal edema" in the distal extremities, antalgic gait, full strength of the bilateral lower extremities, and tenderness to palpation over the SI joint and axial lumbar spine.  (*Id.* at 1936.)  Henson's diagnoses included chronic mechanical lower back pain, severe degenerative disc disease at L51 due to adjacent segment disease at L51, and bilateral sacroiliac joint dysfunction.  (*Id.*)  Harrington ordered medial branch block injections and noted Henson declined having SI joint injections.  (*Id.*)

## C.    State Agency Reports

### 1.    Mental Impairments

On August 28, 2022, Karla Delcour, Ph.D., found Henson had a mild limitation in her ability to understand, remember, or apply information and moderate limitations in her ability to interact with others, concentrate, persist, or maintain pace, and adapt or manage herself.  (*Id.* at 466, 476.)  Dr. Delcour opined that while Henson had "some concentration difficulties," she could "maintain attention and make simple decisions in a setting without strict production standards."  (*Id.* at 469, 479.)  Henson "must avoid public contact" and was limited to "occasional superficial contact with co-workers and supervisors."  (*Id.*)  Henson could "adapt to a setting in which duties are routine and predictable."  (*Id.*)

On January 17, 2023, on reconsideration, Audrey Todd, Ph.D., affirmed Dr. Delcour's Paragraph B findings.  (*Id.* at 486-87, 497-98.)  Dr. Todd further found, "Initial administrative findings are not

affirmed. MER supports some changes in the ratings of sustained concentration, adaptation, and social interaction. No changes to the Narrative of the limitations." (*Id.* at 490, 501.)

    **2.**      **Physical Impairments**

On September 3, 2022, Elizabeth Das, M.D., reviewed the file and opined Henson could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. (*Id.* at 467-68, 477-78.) Dr. Das found Henson could stand and/or walk about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (*Id.* at 467, 477.) Henson could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (*Id.* at 468, 478.) Henson could occasionally stoop, crouch, and crawl. (*Id.*) Her ability to balance and kneel was unlimited. (*Id.*)

On December 27, 2022, on reconsideration, Linda Hall, M.D., affirmed Dr. Das' findings. (*Id.* at 488, 499.)

**D.**    **Hearing Testimony**

During the July 27, 2023 hearing, Henson testified to the following:

- She is unable to work because of her mental state and degenerative disc disease. (*Id.* at 46.) Her discs are not getting better as she gets older. (*Id.*) Her pain and anxiety interfere with her concentration, and she has two to three doctors' appointments a week that she did not have before. (*Id.*)

- Her anxiety manifests as crying spells, constant worry, paranoia, and ruminating thoughts. (*Id.*) She gets very emotional. (*Id.*) She also gets shaky, her heart starts to race, and she gets high blood pressure. (*Id.* at 47.) Trying to talk to people triggers her anxiety. (*Id.*) She does not have difficulty being in public. (*Id.*) She experiences anxiety even when she's at home. (*Id.* at 48.) She never got a driver's license because of her anxiety. (*Id.*) She does not like to be around a lot of people. (*Id.*) She also has depression. (*Id.*) She sees a doctor by video or telephone for her mental health medication management once a month. (*Id.* at 49.) A driver delivers her medication to her. (*Id.*) She takes Cymbalta and Gabapentin for her mental health, and she takes Ambien for sleep. (*Id.*) The medications help, although when she gets anxious in the middle of the day, she wishes she could take something. (*Id.* at 50.) She just started taking Cymbalta two weeks ago, and it helps with her depression. (*Id.*) She is crying less often. (*Id.*)

- She had to leave her job at Jersey Mike's after she was asked to work more than four hours a day. (*Id.* at 51.) She felt so tired one day, grabbed her stuff, and went out the

20

back door without saying anything to anybody.  (*Id.*)  She called the owner the next day and told him she had an anxiety attack, and she needed to leave her job.  (*Id.*)

- She cannot walk very far; she used to walk a lot because she never drove and had no choice.  (*Id.* at 48.)  She can walk for 10 minutes before she needs to take a break and sit down.  (*Id.* at 54.)

- Her lower back hurts more on the left than the right and it goes down her buttocks to her leg.  (*Id.* at 52.)  She underwent a nerve block procedure a few days ago, but she still has a lot of pain.  (*Id.*)  She does not have much neck pain now, although it is still very stiff when she turns to the left.  (*Id.* at 53.)  Her neck exercises help a lot.  (*Id.*)  Her arm is also better, although it still shakes constantly, especially in the morning.  (*Id.*)  She has trouble sitting because her back gets stiff.  (*Id.*)  She switches positions a lot.  (*Id.*)  She usually puts a pillow behind her lower back because her posture is very straight since her back surgery.  (*Id.*)  She can sit for 10 minutes before she needs to switch positions.  (*Id.* at 54.)

The VE testified Henson had past work as a fast-food worker.  (*Id.* at 69.)  The ALJ then posed the following hypothetical question:

> [A]t this time I'd ask you to assume a hypothetical individual with the past jobs you've just described, I'd further ask you to assume that the hypothetical individual would fall within the exertional category of light but would have the following further restrictions: The hypothetical individual could occasionally use ramps and stairs, but never use ladders, ropes, or scaffolds.  The hypothetical individual could occasionally stoop, crouch, and crawl.  The hypothetical individual would be limited to simple tasks, limited to routine and repetitive tasks.  The hypothetical individual would not be able to perform at a production rate pace such as assembly line work but could perform goal-oriented work such as assembly line work but could perform goal-oriented work such as that as an office cleaner.  The hypothetical individual would be limited to a static work environment where they would be able to tolerate few changes in the routine work setting; however, if said changes would occur, any change in job duties would need to be explained.  The hypothetical individual would be limited to occasional interaction with coworkers and would be limited to occasional and superficial interaction with the public.  And Mr. Nimberger, by superficial I mean if a member of the public were to approach and ask directions to the nearest restroom, they would be able to provide that information, but that would be the extent of any interaction that would take place.
>
> Sir, with those restrictions, would a hypothetical individual be able to perform the past work that was described by you in your earlier testimony?

(*Id.* at 70-71.)

The VE testified the hypothetical individual would not be able to perform Henson's past work as a fast-food worker. (*Id.* at 71.) The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as office cleaner, marker, and mail clerk. (*Id.* at 72.)

## III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do

basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).   Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, Henson was insured on the alleged disability onset date, December 31, 2020, and remains insured through December 31, 2027, the date last insured ("DLI").  (Tr. 18.) Therefore, in order to be entitled to POD and DIB, Henson must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2027 (Ex. 7D).

2.    The claimant has not engaged in substantial gainful activity since December 31, 2020, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments: depressive disorder; anxiety disorder; bipolar disorder; post-traumatic stress disorder (PTSD); obesity; and degenerative disc disease of the cervical, lumbar, and thoracic spine (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except she occasionally can use ramps and stairs, but never can use ladders, ropes, or scaffolds. The claimant can occasionally stoop, crouch, and crawl. She is limited to performing routine and repetitive tasks. She is not able to perform at a production-rate pace (such as assembly line work), but can perform goal-oriented work (such as office cleaner). The Claimant is limited to a static work environment, tolerating few changes in a routine work setting, and when said changes do occur any changes in job duties will be explained. The claimant can tolerate occasional interaction with co-workers. She is limited to occasional superficial interaction with the public; superficial means that if a member of the public were to approach and ask, for example, directions to the nearest restroom, the claimant would be able to provide such information, but that would be the extent of the interaction.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May **, 1973 and was 47 years old, which is defined as a younger individual, on the alleged disability onset date (20 CFR 404.1563 and 416.963). She subsequently changed age categories to become an individual closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from December 31, 2020, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 20-29.)

## V.    STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.    Cervical Radiculopathy

In her first assignment of error, Henson argues that the ALJ erred at Step Two in failing to find her cervical radiculopathy was a severe impairment.  (Doc. No. 8 at 14.)  In addition, Henson asserts the ALJ further erred in failing to incorporate limitations for her cervical radiculopathy in the RFC.  (*Id.*)  Henson maintains the ALJ ignored an August 2019 cervical spine x-ray and an October 2020 EMG, and that this evidence, "if properly addressed," would have resulted in additional limitations in the RFC.  (*Id.* at 15.)

26

Henson states, "Despite briefly mentioning the MRI showing stenosis, [the ALJ] failed to address Ms. Henson's testimony regarding symptoms and ignored entirely additional objective evidence that corroborated the severe impairment." (*Id.* at 17.) Therefore, this case must be remanded for a "more thorough analysis" of Henson's cervical radiculopathy. (*Id.*)

The Commissioner responds that "cervical radiculopathy would more accurately be described as a symptom of Plaintiff's underlying cervical degenerative disc disease, which the ALJ found to be a severe impairment (Tr. 21), and which the ALJ fairly evaluated when assessing Plaintiff's RFC (Tr. 24-27)." (Doc. No. 10 at 14.) In addition, the Commissioner argues that the state agency medical consultants "fully considered" Henson's cervical radiculopathy symptoms when rendering their opinions; the ALJ found their opinions to be persuasive, a finding Henson does not challenge on judicial review. (*Id.* at 14-15.)

The Act defines a disability as "an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A medically determinable impairment is one that results from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory techniques. *See* 20 CFR §§ 404.1521, 416.921; Social Security Ruling ("SSR") 96–4p, 1996 WL 374187, at *1 (July 2, 1996). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings. *Id.*

"[U]nder no circumstances may the existence of an impairment be established on the basis of symptoms alone." *Id.* Thus, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." SSR 96–4p (footnote omitted). *See also* 20 C.F.R. §§ 404.1529(b),

27

416.929(b) ("Your symptoms . . .  will not be found to affect your ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present.").  *See also Torrez v. Comm'r of Soc. Sec.*, No. 3:16CV00918, 2017 WL 749185, at *6 (N.D. Ohio Feb. 6, 2017), *report and recommendation adopted by* 2017 WL 735157 (N.D. Ohio Feb. 24, 2017); *Crumrine-Husseini v. Comm'r of Soc. Sec.*, 2:15-cv-3103, 2017 WL 655402, at *8 (S.D. Ohio Feb. 17, 2017), *report and recommendation adopted by* 2017 WL 1187919 (N.D. Ohio March 30, 2017).  The claimant bears the burden of establishing the existence of a medically determinable impairment.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence thereof as the Secretary may require.").  *See also Kavalousky v. Colvin*, No. 5:12-CV-2162, 2013 WL 1910433, at *7 (N.D. Ohio April 19, 2013), *report and recommendation adopted by* 2013 WL 1910843 (N.D. Ohio May 8, 2013).

Once an ALJ has determined a claimant has a medically determinable impairment, the ALJ must then determine whether that impairment is "severe" for purposes of Social Security regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  As noted *supra*, the regulations define a "severe" impairment as an "impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities . . ."  20 CFR §§ 404.1520(c), 416.920(c).  "Basic work activities" are defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §§ 404.1522(b), 416.922(b).  Examples include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting.  *Id*.

28

The Sixth Circuit construes the step two severity regulation as a "*de minimis* hurdle," *Rogers*, 486 F.3d at 243 n.2, intended to "screen out totally groundless claims." *Farris v. Sec'y of Health & Human Servs*., 773 F.2d 85, 89 (6th Cir.1985).  *See also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008).  Thus, if an impairment has "more than a minimal effect" on the claimant's ability to do basic work activities, the ALJ must treat it as "severe."  SSR 96–3p, 1996 WL 374181, at *1 (July 2, 1996).  However, if an ALJ makes a finding of severity as to just one impairment, the ALJ then "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"  SSR 96–8p, 1996 WL 374184 at *5 (July 2, 1996).  This is because "[w]hile a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim."  *Id*.  "For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do."  *Id*.

When the ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments at Step Two does "not constitute reversible error."  *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 244 (6th Cir. 1987); *see also Nejat v. Comm'r of Soc. Sec*., 359 F. App'x 574, 577 (6th Cir. 2009).  The Sixth Circuit has observed that where a claimant clears the hurdle at Step Two (*i.e.*, an ALJ finds that a claimant has established at least one severe impairment) and a claimant's severe and non-severe impairments are considered at the remaining steps of the sequential analysis, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is ... legally irrelevant."  *Anthony*, 266 F. App'x at 457.

At Step Two, the ALJ found Henson's "degenerative disc disease of the cervical, lumbar, and thoracic spine" were severe impairments. (Tr. 21.) In the RFC analysis, the ALJ further found as follows:

> The claimant alleges she experiences frequent left-sided low back pain, radiating down her lower extremity, which limits her ability to perform activists such as housework and self-care. **She further reports neck pain and stiffness, which makes it difficult to turn her head.** The claimant states she can lift no more than 20 pounds, can walk less than one half mile, and is uncomfortable even when sitting, needing to shift positions every few minutes. She reports difficulty bending, reaching, kneeling, and climbing stairs. The claimant further alleges she experiences frequent anxiety attacks and depression. She testified she is paranoid and becomes tearful easily. She states it is difficult to be around groups of people and her social life has deteriorated. Finally, she alleges she experiences poor memory and concentration, which causes difficulty completing tasks (Ex. 6E; testimony).

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> As for the medical evidence, the record shows a long history of low back pain, including a remote history of T10-L5 fusion when the claimant was eight years old (Ex. 2F/8). Follow-up x- rays showed no evidence of hardware failure (Ex. 2F/18, 89). However, imaging showed disc space narrowing at L5-S1 and T9-10 (Ex. 2F/11, 17). **Further, a December 2020 MRI of the claimant's cervical spine showed moderate eccentric spinal canal stenosis with ventral cord indentation at C5-6** (Ex. 2F/17).

> Objective observation showed some abnormalities. For example, examination revealed tenderness and decreased range of motion in the claimant's low back, along with decreased range of motion in her hips (Ex. 2F/20, 85; 21F/21). In addition, the claimant was at times observed ambulating with a mildly antalgic gait (Ex. 2F/84).

> However, the claimant's treatment has been routine and conservative. She has attended physical therapy, and was prescribed muscle relaxants and gabapentin (Ex. 1F/16; 3F/5; 7F/84). She also received a left-sided sacroiliac joint injection (Ex. 2F/98). This treatment proved effective, as the claimant reported pain relief with medication (Ex. 2F/100). The claimant also reported complete relief of her left-sided back pain following the injection (Ex. 2F/16). Indeed, the claimant frequently denied symptoms such as back and joint pain and weakness, and reported getting regular exercise (x. 1F/19; 2F/21, 26, 68; 6F/13, 33; 11F/14; 12F/32, 37, 60; 16F/11; 18F/20). **Overall, providers noted the claimant's**

**neck pain to be well managed,** and her low back pain to be stable and improved (Ex. 2F/20, 73, 81).

Physical examinations confirmed the effectiveness of routine treatment, showing the claimant to be well appearing and in no acute distress, ambulating with a normal gait, and able to stand on her heels and toes (Ex. 1F/17; 2F/12, 32; 4F/88; 6F/13; 12F/28; 14F/59). **Further, examinations showed normal cervical range of motion with no scoliosis or kyphosis**, and no tenderness of the claimant's lumbar spine or hips (Ex. 2F/20, 82; 6F/14; 12F/16, 28). **Moreover, the claimant was observed moving her extremities normally, with normal strength and range of motion and no edema** (Ex. 2F/31, 77. 82; 5F/10; 6F/14; 11F/15; 14F/59; 21F/16). **Neurological examinations similarly were unremarkable**, showing normal sensation and reflexes and no focal deficits (Ex. 2F/31, 53, 82; 4F/95; 11F/15; 12F/17; 21F/28

The records also show that the claimant is obese, with a BMI of 32.34 (Ex. 12F/55). Obesity can exacerbate the claimant's other severe impairments, as excess weight can put additional stress on the back and joints. However, in view of evidence of good overall strength and range of motion, independent ambulation with a normal gait, and effective pain control (Ex. 1F/19; 2F/21-77; 6F/13-33; 11F/14; 12F/32- 60; 16F/11; 18F/20). the record does not establish that the added stress precludes all work.

In sum, the medical evidence supports a finding that, due to some low back pain, the claimant is limited to light work with postural restrictions in order to avoid pain and exacerbation of symptoms.

(*Id.* at 24-25) (emphasis added).

In analyzing the opinions of the state agency medical consultants, the ALJ found as follows:

State medical consultants Elizabeth Das, M.D., and Linda Hall, M.D., found that the claimant can perform light work with postural limitations (Ex. 2A/5-6; 4A/5-6; 6A/6; 8A/6). These findings are persuasive. The consultants have program knowledge, and their findings are supported by their thorough reviews of the record with citation to the evidence, including observations of back tenderness and decreased range of motion, but independent ambulation and normal strength. The findings further are consistent with the evidence, showing ambulation with a normal gait, good pain control, and normal overall strength and range of motion (Ex. 1F; 2F2; 4F/88; 6F; 12F; 14F/59; 21F).

(*Id.* at 26.)

First, Henson's argument is not well-taken, as she testified at the hearing that she was not experiencing much neck pain, and while it was "very stiff" when she turned left, her neck exercises "really

help[ed]." (*Id.* at 53.)  Henson further testified that her arm was better; it just shook "constantly," especially in the morning.[3] (*Id.*)   In addition, Henson told the ALJ the basis for her disability claim was her degenerative disc disease and her mental impairments (*id.* at 46), which the ALJ found to be severe.

Second, the ALJ considered Henson's neck pain and stiffness in the RFC analysis.  (*Id.* at 24-25.) While the ALJ did not discuss the October 2020 EMG, the ALJ discussed x-ray and MRI findings, and cited evidence discussing the 2019 cervical spine x-ray relied upon by Henson.  (*Id.* at 24) (citing Ex. 2F at 17)).  In addition, the ALJ discussed evidence that Henson denied weakness, her neck pain was well-managed, and she had normal, pain-free cervical range of motion and normal neurological examinations. (*Id.* at 24-25.)  Furthermore, as the Commissioner points out, the ALJ found the opinions of the state agency medical consultants persuasive (*id.* at 26), a finding that Henson does not challenge on judicial review.

There is no error.

## B.  Subjective Symptom Analysis

In her second assignment of error, Henson argues that the ALJ "identified minimal findings, but ignored substantial contrary evidence, in an effort to undermine the intensity, persistence, and limiting effects" of Henson's symptoms.  (Doc. No. 8 at 17.)

Regarding her physical impairments, Henson asserts the ALJ rejected her statements because Henson's "treatment was 'routine and conservative' and 'proved effective.'" (*Id.* at 18.)  Henson implies the ALJ erred by "playing doctor" in finding Henson's treatment to be "routine and conservative," as the ALJ "impart[ed] technical medical knowledge he [did] not possess." (*Id.* at 19-20.)

Regarding her mental impairments, Henson argues that the ALJ erred in relying on Henson's activities of daily living as indicative of her ability to maintain full-time employment, and the ALJ's

---

[3] Henson's challenge to the ALJ's subjective symptom analysis is discussed *infra.*

32

statements that Henson's symptoms were impermanent or improved with treatment were inaccurate and inconsistent with the record evidence.[4]  (*Id.* at 18-20.)

Henson maintains the ALJ discussed only positive findings to support the ALJ's conclusions and either disregarded or minimized evidence supportive of a disability finding.  (*Id.* at 19.)

The Commissioner responds that substantial evidence supports the ALJ's subjective symptom analysis.  (Doc. No. 10 at 15.)

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms.  *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011).  First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R. § 416.929(c)(1).  *See also* SSR 16-3p,[5] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[6] determination of the individual's statements based on the entire case record. Credibility determinations

---

[4] As part of this argument, in a single sentence, Henson argues that "[t]he opinions of Nurse Whittaker and Leslie Valentine, LSW, were overlooked."  (Doc. No. 8 at 21.)  Henson then spends three sentences discussing these opinions.  (*Id.*)  The Court finds the argument that the ALJ overlooked these opinions is waived for lack of development.  *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.").  Even if this argument is not waived, it is meritless, as the ALJ weighed and analyzed the opinions of Whittaker and Valentine.  (Tr. 27.)

[5] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3 was in effect at the time of the July 27, 2023 hearing.

[6] SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029, at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an

regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should consider.[7] The ALJ need not analyze all seven factors but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

---

examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

[7] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

Here, the ALJ acknowledged Henson's testimony and other statements regarding her physical and mental symptoms and limitations. (Tr. 24.) The ALJ determined Henson's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (*Id.*) However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with medical evidence and other evidence in the record for the reasons set forth in the decision. (*Id.*) As discussed above, the ALJ discussed positive and negative findings regarding Henson's physical impairments. (*Id.* at 24-25.) Regarding Henson's mental impairments, the ALJ found as follows:

> In addition to her physical impairments, the claimant also was diagnosed with mental disorders including depression, anxiety, PTSD, and bipolar disorder (Ex. 1F/14, 18; 2F/7; 20F/6). The undersigned is cognizant of the substantial overlap in symptomology between different mental impairments, as well as the inherently subjective nature of mental diagnoses. Accordingly, the claimant's psychological symptoms and their effect on her functioning have been considered together, instead of separately, regardless of the diagnostic label attached.
>
> The claimant reported a number of periods of increased stress, such as her ex-boyfriend showing up drunk at her home, sending harassing text messages, and physically assaulting her (Ex. 3F/3, 9; 8F/3). Particularly during these times of added stress, mental status examinations showed some abnormalities, finding the claimant to be depressed, anxious, distractible, and/or tearful, with circumstantial thought process, rapid speech, and rumination (Ex. 1F/17; 3F/4, 9; 8F/4; 9F/5, 18).
>
> The claimant was prescribed psychotropic medication and attended psychotherapy (Ex. 1F/16, 18; 2F/10; 3F/32). She also presented to the emergency department in August 2021 with a reported panic attack and suicidal ideation (Ex. 4F/86, 98). The claimant was admitted for voluntary inpatient treatment (Ex. 4F/88-89). Although the claimant often refused to attend group counseling during her inpatient stay, when she did engage with treatment, she made good progress (Ex. 4F/38-78). The claimant also showed improvement with a change in her medication; she was discharged in stable condition following a two-week admission (Ex. 4F/98- 100). Finally, in June 2022, the claimant entered an intensive outpatient treatment program (Ex. 1F/17). However, she was discharged after three weeks due to excessive missed appointments (Ex. 1F/23; 4F/138).
>
> Otherwise, treatment was relatively effective, with the claimant reporting her moods were improved with medication (Ex. 2F/30; 3F/13). The claimant reported independent activities of daily living, including cooking, cleaning, and

grocery shopping (Ex. 2F/26; 20F/10). She also reported spending time with friends and family, including going on a family vacation and spending the holidays with family (Ex. 3F/3, 24; 12F/14, 37, 60).


Mental status examinations confirmed the relative effectiveness of treatment, showing the claimant to be alert and oriented, pleasant and cooperative, and appropriately groomed and dressed, with normal mood and affect, appropriate behavior, good eye contact, and fully understandable speech (Ex. 1F/17, 46, 62; 2F/12. 64, 84; 3F/22; 5F/9-10; 6F/14; 11F/15; 12F/65). Observations further revealed linear and organized thought process, normal memory and concentration, intact judgment and insight, and normal cognition and intelligence (Ex. 1F/17, 47, 60; 2F/31, 82; 3F/29; 4F/88; 12F/17; 21F/28). Moreover, examinations showed no evidence of delusions or hallucinations, and the claimant otherwise denied homicidal and suicidal ideation (Ex. 1F/15; 3F/14, 31, 45).

Accordingly, due to symptoms including dysphoric moods and difficulty dealing with stress, the claimant should work in an environment with few changes or interpersonal requirements. In addition, due to potential memory and concentration limitations, she is restricted to performing routine and repetitive tasks in a setting with no fast-paced production requirements.

* * *

State medical consultants Karla Delcour, Ph.D., and Audrey Todd, Ph.D. found that the claimant's mental impairment cause mild to moderate limitation in the functional areas, and that she is able to maintain attention and make simple decisions in a setting without strict production standards, she can adapt to a routine and predictable setting, and she should avoid the public and can have occasional superficial contact with co-workers and supervisors (Ex. 2A/4, 6-7; 4A/4, 6-7; 6A/4, 7-8; 8A/4, 7-8). These findings are somewhat persuasive. They are well supported by the consultants' explanations with citation to the record, including observations of normal behavior and memory. They largely are consistent is consistent with the medical evidence, showing difficulties during times of stress such as dysphoric moods, distractibility, ruminations, and rapid speech; but otherwise largely showing the claimant to be alert and oriented, pleasant and cooperative, and appropriately groomed and dressed, with normal mood and affect, appropriate behavior, good eye contact, fully understandable speech, linear and organized thought process, normal cognition, and intact memory, concentration, judgment, and insight.  However, these observations are not consistent with the full extent of the proposed interactional limitations including no contact with the public or only superficial contact with supervisors and co-workers (Ex. 1F; 2F; 3F; 4F/88; 5F; 6F; 11F; 12F; 21F).

36

Sue Whittaker, A.P.N., the claimant's own medical source, opined the claimant has no limitation, mild limitation, or moderate limitation in all activities related to understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself (Ex. 19F). Ms. Whittaker's reference to "disabling anxiety" is inherently neither valuable nor persuasive to the issue of whether the claimant is disabled in accordance with 20 CFR 404.1520b(c) and 416.920b. The opinion otherwise is persuasive. Ms. Whitaker has a treating relationship with the claimant and is an acceptable medical source under POMS DI 22505.003; and the opinion is supported by her treatment notes. Further, the opinion is consistent with the medical evidence, showing difficulties during times of stress such as dysphoric moods, distractibility, ruminations, and rapid speech; but otherwise largely showing the claimant to be alert and oriented, pleasant and cooperative, and appropriately groomed and dressed, with normal mood and affect, appropriate behavior, good eye contact, fully understandable speech, linear and organized thought process, normal cognition, and intact memory, concentration, judgment, and insight (Ex. 1F; 2F; 3F; 4F/88; 5F; 6F; 11F; 12F; 21F).

Leslie Valentine, LISW, the claimant's own medical source, opined the claimant has no limitation, mild limitation, or moderate limitation in areas related to understanding, remembering, or applying information; marked or extreme limitations in most activities related to interacting with others; no limitation or mild limitation in most areas related to maintaining concentration and pace, but marked limitation in avoiding distractions while working and sustaining ordinary routine and regular attendance; and no limitation or mild limitation in most activities related to adapting or managing oneself, but marked to extreme limitation in responding to demands, adapting to changes, and managing her psychologically-based symptoms (Ex. 17F). This opinion is of little persuasive value. Ms. Valentine is not an acceptable medical source. Further, although treatment notes reference the claimant meeting with Ms. Valentine, there is no record of their visits, making it impossible to compare her purported observations with medical records. Finally, marked and extreme limitations are inconsistent with the medical evidence, which regularly showed the claimant to be alert and oriented, pleasant and cooperative, and appropriately groomed and dressed, with normal mood and affect, appropriate behavior, good eye contact, fully understandable speech, linear and organized thought process, normal cognition, and intact memory, concentration, judgment, and insight (Ex. 1F; 2F; 3F; 4F/88; 5F; 6F; 11F; 12F; 21F).

In sum, the undersigned finds that the claimant's subjective allegations and the objective medical evidence support a finding that her impairments cause some limitations in her ability to perform work-related activity. However, the undersigned further finds that the record as a whole—the medical evidence, the opinion evidence, and the claimant's testimony—supports a finding that the claimant retains the ability to perform work activity within the limitations described in the residual functional capacity assessment.

37

(*Id.* at 25-28.)

The Court finds substantial evidence supports the ALJ's assessment of Henson's subjective complaints. The record evidence, as noted by the ALJ, is not entirely consistent with Henson's allegations of disabling conditions. (*Id.* at 24-28.) The ALJ credited some of Henson's subjective symptoms but did not accept them to the extent alleged by Henson because of findings on examinations, her own statements, and activities of daily living, factors to be considered under the regulations. (*Id.*)

Furthermore, "the ALJ was not required to obtain a medical expert to interpret the medical evidence related to [Henson's] impairments." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013). "In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled." *Id.* at 726. Nor did the ALJ interpret "raw medical data beyond [his] ability." *See id.* at 727.

The Court finds it is able to trace the path of the ALJ's reasoning regarding the subjective symptom evaluation in the decision. The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton*, 246 F.3d at 772-73.

## C.    RFC Challenge

In her third assignment of error, Henson argues that the ALJ's determination that she could perform light work lacks the support of substantial evidence, as the ALJ failed to properly evaluate and account for Henson's radiculopathy and pain, as set forth in Henson's first assignment of error. (Doc. No. 8 at 21.) In addition, the ALJ "failed to incorporate appropriate limitations and restrictions" regarding Henson's anxiety, depression, and PTSD, as set forth in part of Henson's second assignment of error. (*Id.*) Henson maintains the ALJ failed to build the requisite "accurate and logical bridge" from the evidence to his conclusions in determining Henson could perform a range of light work. (*Id.* at 23.)

38

The Commissioner responds that, "as already discussed," the ALJ identified substantial evidence in support of the RFC, including a review of Henson's subjective symptoms, analysis of the medical and non-medical record evidence, and review of the medical opinion evidence and prior administrative findings.  (Doc. No. 10 at 21.)  As the Court can trace the ALJ's reasoning regarding the RFC, the Court should reject Henson's final assignment of error.

The RFC determination sets out an individual's work-related abilities despite his or her limitations.  *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96–8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to

determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered.  *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

The Court agrees that the arguments raised as part of this assignment of error consist of challenges to the RFC that are duplicative of Henson's earlier arguments. For the reasons set forth earlier in this decision, the ALJ's RFC findings are affirmed.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


Date: May 30, 2025                                        *s/ Jonathan Greenberg*
                                                         Jonathan D. Greenberg
                                                         United States Magistrate Judge